OPINION OF THE COURT
Richard C. Giardino, J.
This matter comes before the court on a series of motions, starting with the motion of defendant Melvin Blay, individually and doing business as Blay’s Landscaping and Excavating, seeking summary judgment dismissing the complaint and dismissing all of his codefendants’ cross claims. Defendant Rotterdam Square, L.E cross-moves seeking summary judgment on its cross claim against Blay. Defendants Blackburn Group, Inc. and Wilmorite, Inc. cross-move for summary judgment dismissing the complaint and all cross claims against either or both of them. Finally, plaintiffs Joann and Steven Yansak cross-move for permission to amend the complaint to add two new defendants. Defendant Sears Roebuck & Co. has neither submitted a response to these motions and cross motions, nor made any motions of its own at this time.
The action arises from a slip-and-fall incident on January 18, 2000, in the parking lot of Rotterdam Square Mall. Plaintiff Joann Yansak alleges that she slipped and fell due to ice covering the surface of the parking lot, resulting in physical injuries, *462 pain and suffering. Plaintiff Steven Yansak, the husband of Joann Yansak, has alleged that he has suffered a loss of his wife’s services as a result of her injuries. Defendants Blackburn, Sears, Rotterdam and Wilmorite are all alleged to be the owners and/or managers of the parking lot in question and responsible for its maintenance. Defendant Blay is alleged to have been responsible for maintenance of the area in question. Plaintiffs allege that the several defendants were individually or jointly negligent in bringing about the conditions which led to plaintiff Joann Yansak’s injuries.
Defendant Blay’s Summary Judgment Motions
1. Dismissing Plaintiffs’ Complaint.
Blay’s relationship to Rotterdam Square Mall is found in his contract with defendant Rotterdam for removal of snow in the mall’s parking lots. Blay relies on cases such as Espinal v Melville Snow Contrs. (98 NY2d 136 [2002]) to argue that he owed no duty to plaintiffs by virtue of his snow removal contract with Rotterdam. The rule enunciated in Espinal indeed states that a contractual obligation, by itself, is insufficient to give rise to tort liability in favor of a third party. However, three situations are identified where liability could be imposed. The first is where either the contract obligor’s actions have “launched a force or instrument of harm” or his inaction is “at most a refusal to become an instrument for good” (id. at 139, quoting Moch Co. v Rensselaer Water Co., 247 NY 160, 168 [1928]). The second is where the obligor’s past performance has induced detrimental reliance on continued performance and his failure to perform results in injury (id. at 140, citing Eaves Brooks Costume Co. v Y.B.H. Realty Corp., 76 NY2d 220, 226 [1990]). The third situation is where the scope of the contract is so comprehensive that the obligor can be found to owe a duty to “noncontracting individuals reasonably within the zone” of his intended duties under the contract (id., quoting Palka v Servicemaster Mgt. Servs. Corp., 83 NY2d 579, 588 [1994]).
Blay argues that the first situation does not apply here. The contract with Rotterdam requires Blay to plow snow only when notified to do so by mall management. Mr. Blay testified in deposition that he had not been called in to plow for over two weeks prior to the incident at issue. According to Blay, since there had been no performance requested of him under the contract, he could neither be found to have launched a force or instrument of harm nor to have refused to become an instrument of good. *463 For much the same reason, Blay argues that the second situation does not apply. He did not fail to perform under the contract, since he had not been asked to do so. The third situation does not apply, according to Blay, because his contract with Rotterdam was not comprehensive. He was required to plow only if more than two inches of snow fell (and even then, only if called by Rotterdam) and Rotterdam retained responsibility for salting and sanding. Blay notes in this regard that Mrs. Yansak fell on ice, not snow, and that she has testified in deposition that there was not salt or sand visible on the ice.
Without a showing of a duty of care to the injured party, there can be no finding of negligence (see, e.g., Darby v Compagnie Natl. Air France, 96 NY2d 343 [2001]). Blay thus lays out a prima facie case of his entitlement to summary judgment dismissing plaintiffs’ complaint against him (Alvarez v Prospect Hosp., 68 NY2d 320 [1986]). In order to oppose the motion, plaintiffs are required to demonstrate the existence of a triable issue of fact (Zuckerman v City of New York, 49 NY2d 557 [1980]). Instead of offering such evidence, plaintiffs have chosen to concede Blay’s position and withdraw their claim against Blay. Blay’s motion to dismiss plaintiffs’ claim against him must, therefore, be granted.
2. Dismissing Codefendants’ Cross Claims.
Defendants Blackburn, Rotterdam and Wilmorite have all asserted cross claims against Blay for indemnity and contribution. Rotterdam also seeks contractual indemnity based upon its snow removal contract with Blay. For substantially the same reasons asserted by Blay in his summary judgment motion seeking dismissal of the complaint, Blay also seeks dismissal of all cross claims asserted by his codefendants.
a. Contribution and Common-Law Indemnity.
Claims for contribution and/or common-law indemnification require a showing that Blay owed a duty of reasonable care either to plaintiffs or to the cross-claiming defendants, which he breached (Raquet v Braun, 90 NY2d 177 [1997]; Baratta v Home Depot USA, 303 AD2d 434 [2003]; Curley v Gateway Communications, 250 AD2d 888 [1998]; Phillips v Young Men’s Christian Assn., 215 AD2d 825 [1995]). Since Blay has already shown that he owed no duty to plaintiffs, the several cross claims for contribution and indemnification will require the existence of a duty running from Blay to each codefendant. Blay asserts that the only duty he owed to the cross-claiming defendants was that of snow removal as provided for in his *464 contract with Rotterdam. He argues that he fulfilled that duty by plowing snow as requested by Rotterdam under that contract.
A claim for common-law indemnification requires a showing that the claiming party was not actively negligent in contributing to the plaintiff’s injuries (Rosado v Proctor & Schwartz, 66 NY2d 21 [1985]; Salisbury v Wal-Mart Stores, 255 AD2d 95 [1999]). On this point, Blay reiterates his argument that Mrs. Yansak’s injuries were caused by slipping on ice, not snow, and that the responsibility for applying sand or salt to ice was retained by Rotterdam under the terms of the snow removal contract. Since Mrs. Yansak testified to seeing no salt or sand, Blay argues that there must have been negligence on the part of Rotterdam. Blay thus sets out a prima facie showing of his entitlement to judgment dismissing the cross claims.
Defendants Blackburn and Wilmorite do not respond directly to Blay’s argument. Instead, they bring a cross motion (discussed below) asserting that they have never had ownership or management responsibilities at Rotterdam Square Mall, thus precluding a finding of any duty on their part toward either plaintiffs or any codefendants. As noted above, Sears has not submitted a response to Blay’s motion. These defendants thus fail to carry their burden of proof (Zuckerman v City of New York, supra).
Rotterdam, on the other hand, advances two arguments in response to Blay’s motion. First, Rotterdam disputes Blay’s claim that he fulfilled his duty under the snow removal contract. Rotterdam points out that the contract requires Blay to remove snow “from all paved roadways, parking areas, access roads and delivery courts” and that Mr. Blay himself testified in deposition that he did not plow the parking area where plaintiff Mrs. Yansak fell.
Rotterdam also offers the argument, in support of which it offers the affidavit of meteorologist Philip Falconer, that the ice on which Mrs. Yansak fell was formed as a result of Blay’s failure to plow the area where the fall took place after a snowfall which had taken place five days before. Rotterdam thus asserts that Blay breached its contract with Rotterdam and/or performed his duties under the contract negligently. Either characterization, according to Rotterdam, is sufficient to preclude summary judgment against its cross claim for common-law indemnification and contribution. In support of this contention, Rotterdam also cites cases such as Baratta v Home Depot USA (supra) and McBride v Stewart’s Ice Cream Co. (262 AD2d 776 [1999]) where summary judgment was denied in similar circumstances.
*465 There are indeed issues of fact which preclude the award of summary judgment to Blay dismissing Rotterdam’s cross claim for common-law indemnity and contribution. In the depositions held thus far, Blay has testified that it was not his duty to plow the area in question. According to Blay, mall employees plowed that particular parking area at the time of the events at issue. Counsel for Blay also points to maintenance logs kept by mall management which show maintenance employees plowing snow during that time frame. According to the deposition testimony of mall general manager Anthony DiMarco, however, it was Blay’s responsibility to plow the area at issue.
The contract provision invoked by Rotterdam requires snow removal by Blay, as quoted above, but the quoted sentence goes on to say, “at the direction of the Site Supervisor or an authorized representative.” The contract also provides that Blay is to plow only when notified that two inches has fallen at the mall. According to Mr. DiMarco’s deposition testimony, it was the responsibility of the site supervisor or the chief of security to contact Blay when two inches of snow had fallen at the mall. No deposition testimony has been offered on this motion from the site supervisor, listed in the accident report concerning Mrs. Yansak’s fall as Steven Pearson, or of any other “authorized representative” who may have directed Blay’s activities during the time frame in question. It is not clear on the record thus far whether the phrase “at the direction of the Site Supervisor” simply refers to notifying Blay when the requisite two inches of snow has fallen at the mall, triggering his duty to plow, or whether it also includes particulars such as which areas to plow.
On Rotterdam’s second argument, Blay and Rotterdam have disputed the amount of weight which can be accorded Mr. Falconer’s opinion. However, it is not necessary to address that question in order to find another fact issue. Mr. Falconer’s affidavit points to a “significant” snowfall five days prior to January 18, 2000, as having provided the moisture for the ice on which Mrs. Yansak fell. Viewing Mr. Falconer’s data in the light most favorable to Rotterdam as the nonmoving party (Rifenburgh v Wilczek, 294 AD2d 653 [2002]), it is possible to conclude that more than two inches of snow fell on that date at the mall. The ordinary course of operations of the mall, as testified to by Mr. DiMarco, would have included a telephone call to Blay to plow the snow. Blay, however, has testified that he had not been called to plow for over two weeks prior to Mrs. Yansak’s fall. The question of a breach of contract or negligence by Blay can *466 not be determined as a matter of law on this record, thus precluding summary judgment in Blay’s favor against Rotterdam’s cross claim.
b. Contractual Indemnification.
Rotterdam also asserts a claim for contractual indemnification. The contract between Rotterdam and Blay states, in relevant part:
“To the extent permitted by law, the Contractor further agrees that he . . . shall indemnify the Owner, the Construction Manager, its or their officers, agents and employees, and save them harmless from any and all liability . . . arising out of or in connection with the work, or by reason of the operations under this contract, whether such liability be the result of the alleged active or passive negligence of the Owner or its agents . . . .”
Blay argues that this provision is inapplicable because the indemnification arises only in connection with his work. He reiterates his argument above that he simply had nothing to do with the area in question and that Rotterdam was responsible for salting and sanding, concluding that Mrs. Yansak’s fall had nothing to do with his work. Blay further argues that this provision is void under the prohibition on contracting for the indemnification of one’s own negligence found at General Obligations Law § 5-322.1 (1).
Rotterdam responds to Blay’s first argument by reiterating its argument that it was Blay’s responsibility to plow the area in question and that the ice on which Mrs. Yansak fell formed as a result of Blay’s failure. As set forth above, the scope of Blay’s duty and whether he breached that duty are both questions of fact. The contract provides indemnification for liability arising from the work done under the contract. The scope of Blay’s duty and the extent of the “work” or “operations” under the contract are intertwined, if not identical, questions. The applicability of the indemnification provision will thus turn on the same factual determination as will Rotterdam’s entitlement to common-law indemnification or contribution, precluding summary judgment in favor of Blay on this ground.
Rotterdam also disputes Blay’s characterization of the indemnification provision as void. Rotterdam notes case authority for the proposition that a party can contract for indemnification of its own active or passive negligence, so long as the indemnification is clearly stated in the contract. Rotterdam also *467 cites the Fourth Department opinion in Pieri v Forest City Enters. (238 AD2d 911 [1997]) and the First Department opinion in Kotopoulos v Nathan Hale Gardens (235 AD2d 276 [1997]) for the proposition that a snow removal contract does not fall within the definition of prohibited contracts under General Obligations Law § 5-322.1. Rotterdam cites the Third Department opinion in Salisbury v Wal-Mart Stores (supra) as adopting this viewpoint, in that the court appears to indicate that it would favor such a provision in a snow removal contract. Finally, Rotterdam supplies a copy of a 2001 decision and order from Supreme Court, Saratoga County, in which the Salisbury case is cited in support of an award of summary judgment in favor of a mall owner on a similar claim.
Blay points out that the language from Salisbury relied upon by Rotterdam is found in dicta at the very end of a decision that concerns implied indemnity, not contractual indemnity. Blay also argues that the decision in Fieri, being from another appellate department, is not controlling. Given the fact that all of these decisions turn on the language of the particular contracts at issue, but none of them actually set out the contract language which they interpret, it is not possible to render a decision on the contract provision at issue here based solely on these other holdings. An examination of that provision, and the statute advanced by Blay, is necessary.
As a general rule, while “not favored in the law,” a contract requiring a party to indemnify another for its own acts of negligence is valid and enforceable (see, Levine v Shell Oil Co., 28 NY2d 205 [1971]; Murray v Wilbur Curtis Co., 189 AD2d 980 [1993]). The major exception to this rule is when indemnity is prohibited by a statute, such as General Obligations Law § 5-322.1 (1) (see, e.g., Potter v M.A. Bongiovanni, Inc., 271 AD2d 918 [2000]). This statute prohibits:
“A covenant, promise, agreement or understanding in, or in connection with or collateral to a contract or agreement relative to the construction, alteration, repair or maintenance of a building, structure, appurtenances and appliances . . . purporting to indemnify or hold harmless the promisee against liability for damage arising out of bodily injury to persons or damage to property contributed to, caused by or resulting from the negligence of the promisee, his agents or employees” (General Obligations Law § 5-322.1 [1]).
*468 On the surface, this language would appear to be applicable to this case, in that it appears that Rotterdam contracted with Blay to perform maintenance on an appurtenance to its mall.
Snow removal is commonly considered to be a part of general maintenance and is frequently referred to as such in court decisions (see, e.g., Parker v Rust Plant Servs., Inc., 9 AD3d 671 [2004]; Gaitan v Regional Maintenance Corp., 6 AD3d 495 [2004]). In this case, deposition testimony has established that the mall’s maintenance department was responsible for salting and sanding in the parking lot. The “Snow Condition” log, which was maintained by the mall maintenance department, showed maintenance employees plowing snow.
The parking areas and roadways of a shopping mall would also appear to fall within the definition of “appurtenances” to the mall building. One basic definition of the term is “[s]omething that belongs or is attached to something else” (Black’s Law Dictionary 98 [7th ed 1999]). In the context of deeds, an appurtenance is defined as “something which belongs to another thing as principal, and passes as incident to the principal thing” (4 Warren’s Weed, New York Real Property, Deeds § 7.04 [4th ed]). An appurtenant easement is one which passes with land owned by a party which has a benefit over the land of another to the extent that it is necessary to the use of the property passing (5 Warren’s Weed, New York Real Property, Easements § 1.03 [1] [a] [4th ed]).
The purpose of the statute also seems to fit the circumstances of this case. A seminal decision from the Court of Appeals decision addressing section 5-322.1, which is cited and discussed by both Blay and Rotterdam, is Itri Brick & Concrete Corp. v Aetna Cas. & Sur. Co. (89 NY2d 786 [1997]). When addressing the effect of the statute on two construction contracts containing indemnification provisions, the Court of Appeals noted:
“The purpose [behind] this provision was to prevent a prevalent practice in the construction industry of requiring subcontractors to assume liability by contract for the negligence of others. The Legislature concluded that such ‘coercive’ bidding requirements unnecessarily increased the cost of construction by limiting the number of contractors able to obtain the necessary hold harmless insurance, and unfairly imposed liability on subcontractors for the negligence of others over whom they had no control. The agreements also needlessly created expensive *469 double coverage for hold harmless or general liability insurance.” {Id. at 794 [citations omitted].)
A review of the contract document attached to the motion papers shows a fairly straightforward, handwritten proposal from Blay, dated September 21, 1998, which was incorporated by Rotterdam into a six-page, typewritten form contract with an addendum. The form is dated September 29,1998, and signed by Blay on October 28, 1998. It is interesting to note that the form used by Rotterdam for this agreement is a construction contract referring to the parties as “Owner” and “Contractor.” It is also interesting to note that the form includes large font headings at the left margin which label the various provisions, except for the indemnification provision at issue and a provision requiring “Contractor” to guarantee his work. While there is no evidence here of a coercive bidding requirement for this job, the legislative intent to address unfair imposition of liability on a party for actions of others over whom he has no control is squarely applicable.
How does the case authority cited by Rotterdam apply to this analysis? A reading of the Kotopoulos decision shows that Rotterdam may be misreading the operative language. The operative portion of the opinion states: “Review of the contract entered into between the management agent and the company it hired to maintain the building shows that the latter contractually obligated itself to indemnify defendants building owner and management agent for any and all liability incurred by them as a result of its negligent acts.” (Kotopoulos v Nathan Hale Gardens, supra at 277.)
While the first use of the word “it” in the quoted passage clearly refers to the management agent, the use of the phrase “its negligent acts” appears to refer to the maintenance company. The plural pronoun “them” was used to refer to the owner and management agent collectively. The contract at issue in Kotopoulos thus appears to have been one where the maintenance contractor indemnified the owner and the management agent for negligent acts by the maintenance contractor, not those of the owner or management agent.
Unfortunately, the Fieri opinion is not instructive, since it simply states, without further explanation or discussion of the contract terms, that the contract at issue there did not fall within the definition of section 5-322.1. The Salisbury opinion cites to Fieri, but does so in the context of whether a snow removal contractor owes a duty to a third party, not with regard *470 to section 5-322.1, which is not mentioned, in the Salisbury opinion. As noted by Blay, the Salisbury opinion is expressly limited to the doctrine of implied indemnity (Salisbury v WalMart Stores, supra at 96).
Considering all of these factors, this court holds that the contract between Rotterdam and Blay is subject to the prohibition of General Obligations Law § 5-322.1. However, cases decided since the Itri Brick decision prevent the statute from resulting in the dismissal of Rotterdam’s cross claim at this point. In Potter v M.A. Bongiovanni, Inc. (supra at 919), the Third Department held that while the general contractor could not receive indemnity for its own negligence from its subcontractor, if the contractor was ultimately found to be free of negligence, the subcontractor would be required to indemnify the contractor for injuries arising out of the subcontractor’s negligence. As already noted, the ultimate determinations of negligence on the part of either Rotterdam or Blay are factual determinations yet to be made. Rotterdam may or may not be found negligent vis-a-vis plaintiffs and Blay may or may not be found negligent in the performance of its contractual duties.
Defendant Rotterdam’s Summary Judgment Motion
Rotterdam’s summary judgment motion is directed solely at Blay and is based on its claim for contractual indemnification. Based on the discussion above, that claim presents questions of fact which prevent an award of summary judgment.
Joint Motion by Defendants Blackburn and Wilmorite
Blackburn and Wilmorite jointly move for dismissal of the complaint and all cross claims asserted by their codefendants. Blackburn relies chiefly on representations made by its counsel during Mr. DiMarco’s deposition, and in subsequent communications with plaintiffs’ counsel, to the effect that Blackburn’s involvement with the mall was solely as a risk management advisor and not in any capacity which would yield a duty of care toward plaintiffs or codefendants. Since neither plaintiffs nor any of the codefendants oppose the motion by Blackburn (plaintiffs having actually stipulated to discontinue this action as against Blackburn while this motion has been pending), the Alvarez/Zuckerman test cited above yields an award of judgment in favor of Blackburn.
Wilmorite, too, argues that it has never acted in any capacity which would yield a duty to plaintiffs or codefendants. Wil *471 morite submits the affidavit of Mark Foerster, executive vice-president of Wilmorite, Inc., to that effect. In addition, the deposition of Mr. DiMarco includes testimony to the effect that an entity known as Wilmorite Property Management, Inc. was the property manager of the mall at the time of the events here at issue, not Wilmorite, Inc. At that same deposition, counsel for Wilmorite represented that defendant Rotterdam is, and always has been, the owner of the mall. If uncontroverted, this evidence would be sufficient to pass muster under Alvarez v Prospect Hosp. (supra).
Plaintiffs oppose Wilmorite’s motion. However, plaintiffs’ argument is based almost entirely on an asserted question of fact as to which entity was the property manager of the mall on the date in question. This argument concerns entities stated as Wilmorite Property Management, Inc. and Genesee Management, Inc., which will be discussed in greater detail below in the context of plaintiffs’ motion to add those corporations as parties defendant. Plaintiffs thus fail to carry their burden under Zuckerman. As with Blackburn’s motion, no codefendants offer opposition to Wilmorite’s motion. Wilmorite, therefore, is also entitled to the dismissals it seeks.
Plaintiffs’ Motion to Amend
Plaintiffs move to amend the complaint to add two parties: specifically, Genesee Property Management, Inc. (GPM) and Wilmorite Property Management, Inc. (WPM). Plaintiffs argue that there has been “substantial confusion” concerning the proper identity of the property manager of the mall. They point to Mr. DiMarco’s deposition testimony as raising a question as to which of these entities was the property manager at the time of Mrs. Yansak’s fall. Plaintiffs also supply the deposition testimony of Mr. Alfred Carpenter, a security officer at the mall, who testified that there was a change from GPM to WPM at some point around the time of the incident at issue.
GPM is referenced in the contract between Rotterdam and Blay as the agent for Rotterdam. The original contract with Blay was signed by GPM and some of Blay’s duties (such as furnishing proof of proper insurance) are specifically owed to GPM. When plaintiffs served notice for a deposition of defendant Wilmorite, Mr. DiMarco was produced as the witness for deposition and testified that he was actually an employee of WPM, which was the property manager of the mall. While Di-Marco testified that he began working at the mall on January *472 31, 2000, which was after Mrs. Yansak’s fall, he also testified that he signed the accident report at issue here, which was generated on January 18, 2000. Plaintiffs requested a copy of the contract between Rotterdam and WPM during the deposition, but no such contract is in evidence here. Overall, it appears to be logical that GPM and WPM would be defendants in this action.
However, the three-year statute of limitations for personal injury actions expired in January of 2003. If plaintiffs’ motion to amend were granted, they could not serve process upon either GPM or WPM without application of the “relation back doctrine” found in CPLR 203. The three-part test for application of the relation back doctrine, as set forth by the Court of Appeals in Buran v Coupal (87 NY2d 173 [1995]), requires a showing that (1) both claims arose out of the same conduct, transaction or occurrence, (2) the new party is united in interest with the original defendant, by reason of which relationship the new party can be charged with sufficient notice of the action that it will not be prejudiced in maintaining a defense on the merits, and (3) the new party knew or should have known that, but for a mistake by the plaintiff as to the identity of the proper parties, the action would have initially been brought against the new party as well.
Plaintiffs assert that this test is met on the record here. Stated briefly, plaintiffs argue that the claims against either of these entities arise from a single event, that being Mrs. Yansak’s fall. Plaintiffs argue that the parties sought to be added are “united in interest” with Rotterdam because they hold themselves out as a single business unit — Rotterdam as mall owner and either GPM or WPM as agent/manager of all day-today operations. Given the presence of Mr. DiMarco at deposition and the fact that counsel for Rotterdam at least appears to be counsel for WPM, plaintiffs also contend that WPM has had actual notice of this action. Plaintiffs further argue that the overriding object of the Buran test — to prevent prejudice to a new defendant — would be met here given the close relationship, both contractually and legally, among Rotterdam, GPM and WPM.
Rotterdam takes issue with plaintiffs’ position, arguing that it is not united in interest with either GPM or WPM. Specifically, Rotterdam notes case authority holding that if one party has a defense which is unavailable to another party, then the two cannot be found to be united in interest. Rotterdam notes *473 that the same defense utilized by Blay in his motion to dismiss the complaint — that his contract with Rotterdam did not impose any duty toward plaintiffs — is available to both GPM and WPM, but not available to Rotterdam. Rotterdam thus asserts that plaintiffs cannot meet the second prong of the Buran test.
One of the cases cited by Rotterdam is the Third Department decision in Matter of Emmett v Town of Edmeston (3 AD3d 816 [2004]). That case is distinguishable from the case at bar in that the first prong of the Buran test was the main focus of analysis. The wrong complained of was the grant of a zoning variance. The Town of Edmeston had promulgated the zoning regulation, but it was the zoning board of appeals (ZBA) which had the power to issue the variance. The plaintiffs were not allowed to add the ZBA as a defendant because its actions did not constitute the same “conduct, transaction or occurrence” as those of the Town (at 819). However, the Emmett case is still useful for examining the second prong of the Buran test. While the Emmett decision utilizes the second prong of the Buran test, it does not mention the “identity of defenses” aspect advanced by Rotterdam. Instead, Emmett holds that the two entities did not “stand or fall together and a judgment concerning the variance [would] not similarly affect both entities” (id.). This distinction brings out an aspect of the united-in-interest test that impacts this case.
The test for determining unity of interest does not appear to be found in a single, succinct statement. The cases cited by Rotterdam (Emmett v Town of Edmeston, supra; Losner v Cashline, L.P., 303 AD2d 647 [2003]; Hilliard v Roc-Newark Assoc., 287 AD2d 691 [2001]; Connell v Hayden, 83 AD2d 30 [1981]) use several different formulations when applying the Buran test. For example: where the two defendants “are united in interest . . . their defenses will be the same and they will either stand or fall together with respect to the plaintiffs claim” (Losner v Cashline, supra at 648); “[w]hen parties are united in interest, the judgment against one will similarly affect the other” (id.)-, “the defenses available to two defendants will be identical, and thus their interests be united, only where one is vicariously liable for the acts of the other” (Hilliard v Roc-Newark Assoc., supra at 692).
These varying aspects of being “united in interest” appear both to result from, and to depend upon, the various fact scenarios presented to the courts addressing the issue.
Many of the formulations used to apply the second prong of the Buran test come from the extensive analysis found in the *474 Second Department decision in Connell v Hayden (supra). The several formulations found in that decision appear to deal with different facets of the overriding question of unity of interest, which the court in Connell held must be “determined from an examination of (1) the jural relationship of the parties whose interests are said to be united and (2) the nature of the claim asserted against them by the plaintiff’ (id. at 42-43).
Connell was a medical malpractice action involving individual doctors and a medical services corporation. It applies the united-in-interest test to analyze (1) the liability of the corporation for acts of its employees, and (2) the liability of an employee for the acts of a coemployee. In its analysis of the corporation/employee relationship, the Connell decision arrives at the vicarious liability formulation quoted above. The Court holds that where a master and servant relationship exists, the master and the servant are united in interest because the acts of the servant in the course of his or her employment can be imputed to the master. Indeed, the Connell opinion holds that the master and servant are united in interest irrespective of which party is served initially and which is sought to be added later. More importantly where the case at bar is concerned, Connell also finds unity of interest irrespective of the defense available to the employer (but not the employee) that the employee’s acts were outside the scope of his or her employment (id. at 47-48).
The master/servant analysis from Connell appears to be at least one basis for the Third Department decision in De Sanna v Rockefeller Ctr., Inc. (9 AD3d 596 [2004]), which is cited by plaintiffs in this case. The De Sanna decision allowed the joinder of a building owner in a personal injury action where the building manager had been served initially. The Third Department ruled that the owner of the building “could be found to be vicariously liable if [the building manager], even as an independent contractor, is ultimately found to be its agent” (id. at 599 [emphasis added; citations omitted]).
This language from De Sanna would appear to be fatal to Rotterdam’s argument. Even as independent contractors, if either GPM or WPM were acting as agent for Rotterdam, they would be united in interest with Rotterdam. Plaintiffs argue that such an agency relationship existed, and the terms of the contract at issue support that argument. The contract between Rotterdam and Blay specifically references GPM as agent for Rotterdam. The deposition testimony of Mr. Blay and Mr. DiMarco indicates that WPM is the successor to GPM. An additional *475 consideration from the Connell opinion, however, serves to distinguish the situation at bar.
The Connell opinion points out that the reason an employer and employee can be united in interest in the face of an additional defense in favor of the employer is the fact that “[the] defense does not go to the merits of the plaintiffs claim of negligence or malpractice,” but rather cuts off the chain of vicarious liability (Connell v Hayden, supra at 48). In this case, however, the defense asserted by Rotterdam as being available to GPM and WPM goes directly to the merits of plaintiffs’ negligence claim — the presence or absence of a duty toward plaintiffs. Absent a comprehensive delegation of duties by Rotterdam to either GPM or WPM of the sort discussed in Espinal v Melville Snow Contrs. (supra), the jural relationship between Rotterdam and either GPM or WPM is not the same as the master/servant relationship in Connell.
The exact nature of the arguments and defenses involved in the De Sanna case is not spelled out in the opinion, but the factual recitation given in support of the ruling appears to be more in line with the situation described in Connell than the facts available here. On this record, Rotterdam is correct that GPM and WPM have a defense available to them which is unavailable to Rotterdam, preventing plaintiffs from meeting the second prong of the Buran test for joinder of these parties. However, an examination of the contract between Rotterdam and GPM or WPM might yield a different result if the management duties described therein are truly comprehensive.
Accordingly, for the foregoing reasons, it is ordered that the motion by defendant Melvin Blay, individually and doing business as Blay’s Landscaping and Excavating, to dismiss the complaint is granted and the complaint is hereby dismissed as to defendant Blay in both of those capacities; and it is further ordered that defendant Blay’s motion to dismiss all cross claims against him is granted as to defendants Blackburn Group, Inc., Sears Roebuck & Co. and Wilmorite, Inc., and the cross claims of those defendants are hereby dismissed; and it is further ordered that defendant Blay’s motion to dismiss all cross claims against it is denied as to defendant Rotterdam Square, L.P; and it is further ordered that the motion of defendant Rotterdam Square, L.P, for summary judgment on its cross claims against defendant Blay is denied; and it is further ordered that the joint motion of defendants Blackburn Group, Inc., and Wilmorite, Inc. to dismiss the complaint against them is granted and the *476 complaint is hereby dismissed as to defendants Blackburn Group, Inc. and Wilmorite, Inc.; and it is further ordered that plaintiffs’ motion to amend the complaint to add two new parties defendant is denied without prejudice to its renewal should disclosure of the contracts between Rotterdam Square, L.E and either Wilmorite Property Management, Inc. or Genesee Property Management, Inc. reveal a basis for their joinder; and it is further ordered that all of the above rulings are rendered “without costs.”